UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

RAMON LOPEZ,

                 Plaintiff,

v.

GEORGE ZOUVELOS, VINY CONWELL,
and CITY OF NEW YORK,

                 Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-6474 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Ramon Lopez, currently incarcerated at Mid-State Correctional Facility,

commenced the above-captioned action on November 14, 2013[1] and, by his Second Amended

Complaint filed on April 19, 2014,[2] asserts claims pursuant to 42 U.S.C. § 1983 against

Defendants George Zouvelos, Viny Conwell and the City of New York for alleged violations of

his rights under the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States

---

[1] Plaintiff's original Complaint named George Zouvelos, Viny Conwell, the New York City Police Department ("NYPD") and the New York City Department of Correction ("DOC") as Defendants and asserted claims pursuant to 42 U.S.C. § 1983 for alleged violations of Plaintiff's and his family's Fourth, Fifth, Eighth and Fourteenth Amendment rights. (Compl., Docket Entry No. 1.) By Memorandum and Order dated November 4, 2014, the Court granted Plaintiff's request to proceed *in forma pauperis* and dismissed Plaintiff's claims against the NYPD and the DOC with prejudice and granted Plaintiff leave to file an amended complaint and replead his claims against Zouvelos and Conwell. *Lopez v. Zouvelos*, No. 13-CV-6474, 2014 WL 843219 (E.D.N.Y. Mar. 4, 2014), *available at* Docket Entry No. 9. Plaintiff was also given leave to add the City of New York as a defendant to the extent he intended to pursue a claim based on municipal liability. *Id.*

[2] On March 3, 2015, counsel appeared in this case on Plaintiff's behalf. (Not. of Appearance of Karamvir Dahiya, Docket Entry No. 45.) At all times prior to March 3, 2015, Plaintiff proceeded *pro se*.

Constitution.[3]  (Am. Compl., Docket Entry No. 12.)  Defendants the City of New York and Zouvelos move to dismiss Plaintiff's Amended Complaint for failure to state a claim.[4]  (City Not. of Mot. to Dismiss, Docket Entry No. 40; City. Mem. in Support of Mot. to Dismiss ("City Mem."), Docket Entry No. 41; Conwell Not. of Mot. to Dismiss, Docket Entry No. 39; Conwell Mem. in Support of Mot. to Dismiss ("Conwell Mem."), Docket Entry No. 39.)

For the reasons set forth below, the Court grants Zouvelos' motion to dismiss and dismisses the Amended Complaint as to him.  The Court also *sua sponte* dismisses the Amended Complaint as to Conwell.  The Court grants the City of New York's motion to dismiss the Amended Complaint against the City of New York but directs the Clerk of Court to substitute Jane Doe # 3, John Doe # 4 (Badge # 665), John Doe # 5 (Badge # 1683), and John Doe # 6 (Badge # 11511) as Defendants.  The Court orders the City of New York to ascertain the full names and service addresses of Jane Doe # 3 and John Does # 4, 5 and 6 and to provide this information to Plaintiff and the Court within thirty (30) days from the date of this Memorandum and Order.  Upon receipt of the foregoing information, the Clerk of Court is directed to amend the caption to substitute the names for Jane Doe # 3 and John Does # 4, 5 and 6 and to forward copies of the following documents to the United States Marshal Service for service upon Jane Doe # 3 and John Does # 4, 5 and 6: (1) the Amended Complaint; (2) summonses for Jane Doe # 3 and John Does # 4, 5 and 6; and (3) this Memorandum and Order.

---

[3]  This action was transferred to this Court from the United States District Court for the Northern District of New York by order dated November 19, 2013.  (Docket Entry No. 4.)

[4]  Defendant Conwell was not served until June 25, 2015, and has yet to answer or otherwise appear in this case.  (Supp. Summons, Docket Entry No. 48.)

## I. Background

### a. Plaintiff's apprehension and surrender to custody

On May 22, 2012, New York City Police Department ("NYPD") Officer John Doe # 1 of the 83rd Precinct, Warrant Squad, visited Plaintiff's home to arrest Plaintiff pursuant to an "erroneous warrant" that appeared to be outstanding in online records of active bench warrants maintained by the New York State Unified Court System.[5] (Am. Compl. 7.)[6] The warrant had been vacated by Judge William Garnett of the New York State Supreme Court, Criminal Term, on May 21, 2012, but, Plaintiff claims, the warrant still appeared to be outstanding on the system due to a clerical error by the Kings County Supreme Court Clerk. (*Id.*) After arriving at Plaintiff's home, John Doe # 1 determined that the warrant had been vacated. (*Id.*) Plaintiff received confirmation from John Doe # 1 that the warrant had been vacated and John Doe # 1 explained to Plaintiff that the warrant erroneously appeared to be outstanding due to "a lapse in the system." (*Id.*) John Doe # 1 then left Plaintiff's home without apprehending him. (*Id.*)

On May 24, 2012, Zouvelos, a bail bondsman and the owner of a bail bonds agency then known as NYC Pay Bail, instructed his partner, Conwell, to "unlawfully arrest" Plaintiff on the basis of the erroneous online records. (*Id.*) Conwell, who is a bounty hunter, prepared to apprehend Plaintiff with the help of Conwell's "four-man crew." (*Id.*) Before going to Plaintiff's home to take Plaintiff into custody, Conwell and the agents under his supervision went to the 83rd Precinct to "state why his team was in the area" and provide notification about "who

---

[5] The facts alleged in the Amended Complaint are assumed to be true for the purposes of this motion.

[6] As the pages of the Amended Complaint are not consecutively numbered, all citations to pages of the Amended Complaint refer to the Electronic Document Filing System ("ECF") pagination.

he was arresting." (*Id.*) Upon reporting to the 83rd Precinct, Conwell spoke with "command[ing] officer" John Doe # 2 who "authorized Conwell to illegally arrest Plaintiff" and "act[ed] in concert" with Conwell "without inquiring into the basis of [Conwell's] claim" that Plaintiff's arrest was warranted. (*Id.*)

Although on May 22, 2012, John Doe # 1 had created and logged a "known report" indicating that the warrant pertaining to Plaintiff was erroneous, John Doe # 2 did not retrieve the report and failed to verify Conwell's claim that there was an outstanding bench warrant as to Plaintiff. (*Id.* at 7–8.) John Doe # 2 did not check the "internal record source and external databases" that were available to John Doe # 2. (*Id.*) Instead, John Doe # 2 sent Conwell and his crew, unescorted, to Plaintiff's home. (*Id.* at 8.)

After notifying the 83rd Precinct, Conwell and his agents went to Plaintiff's home to apprehend him. (*Id.*) "[W]ithout a warrant or court order," Conwell and his agents "forced themselves inside the home" and all those present, including senior citizens and children, were horrified by the "harsh treatment and lethal weapons" of Conwell and his agents. (*Id.*) Plaintiff also alleges that Conwell and his agents brought a photographer who took unauthorized photographs of Plaintiff's family and posted them on social media to "publicize and circumscribe humiliation" to Plaintiff and his family. (*Id.*)

Plaintiff claims that, in failing to escort Conwell, John Doe # 2 failed to "acknowledge the significance of the public's 'safety, peace, and order'" and the NYPD's responsibility to "protect and serve" in violation of NYPD custom or policy. (*Id.*) Plaintiff also alleges that John Doe # 2 did not adhere to the NYPD's custom or policy by disregarding the NYPD motto "Courtesy, Professionalism, Respect" when he failed to intervene and come to Plaintiff's aid and instead "act[ed] in concert" with Conwell. (*Id.*) Plaintiff claims Lieutenant Arsenio Camilo of

the 83rd Precinct was also on duty the night of Plaintiff's arrest and witnessed the events at the 83rd Precinct as they unfolded. (*Id.*)

Following Plaintiff's apprehension by Conwell and his crew, Plaintiff was placed in handcuffs and taken to the 83rd Precinct by Conwell and his agents. (*Id.* at 9) While Plaintiff waited in Conwell's Jeep outside of the 83rd Precinct in handcuffs, and under the supervision of Conwell's agents, Conwell completed paperwork inside the 83rd Precinct. (*Id.*) Plaintiff remained with Conwell and his agents until about 4:30 AM on May 25, 2012, at which point Conwell transported Plaintiff to Rikers Island. (*Id.*)

Upon his arrival at Rikers Island, Plaintiff overheard John Doe # 3, a correction officer stationed at the "front desk" of the "intake area," tell Conwell, "I'm going to charge you a fee for each body brought in." (*Id.*) Plaintiff alleges that this comment evidences a "conspiracy" to "obstruct justice and hold Plaintiff against his will" and, Plaintiff claims, the intake officer accepted Conwell's "frivolous paperwork" without confirming that Plaintiff was, in fact, a fugitive from justice. (*Id.*)

On May 29, 2012, Plaintiff was brought before New York State Supreme Court Judge John P. Walsh for a bail hearing. (*Id.*) Judge Walsh set bail and Plaintiff was returned to Rikers Island following the hearing. (*Id.*) At an unspecified time thereafter, Plaintiff was transferred from Rikers Island to the Brooklyn Detention Center ("BK Detention Center"). (*Id.*)

### b. Ankle and knee injuries sustained while incarcerated

On an unspecified date, Plaintiff fractured his ankle and sprained his knee while he was incarcerated at BK Detention Center. (*Id.* at 4, 10.) Plaintiff sustained these injuries during recreation and they were caused by a deteriorated rubber mat with a non-visible hole. (*Id.* at 10.) Plaintiff alleges that, although BK Detention Center was "renovated and reopened in early

2012," it "appears the [mats] were overlooked by the assigned contractors." (*Id.*) As a result of DOC's "failure to maintain a safe environment," Plaintiff suffers from "severe pain" to his knee and ankle and "constantly feels the aftermath" of these injuries and, at times, is "unable to sit or stand for long periods" or jump as he used to prior to the injuries. (*Id.*) Plaintiff alleges that he sought immediate medical attention for his knee and ankle injuries but was only "provided the bare minimum, an [ACE] bandage and pain medication." (*Id.* at 4, 10.) Plaintiff claims that he received no "follow up" treatment from the medical staff. (*Id.* at 4.)

### c. Strip search while incarcerated

On October 12, 2012, while Plaintiff was incarcerated in "the 4 building (4 Main Lower)" on Rikers Island, Plaintiff was improperly strip searched by "special unit correction officers" John Doe # 4 (Badge # 665), John Doe # 5 (Badge # 1683), and John Doe # 6 (Badge # 11511). (*Id.* at 10.)

Plaintiff alleges that, in the course of an argument between Jane Doe # 3 and an inmate who did not speak English, "Plaintiff offered to assist the captain" by translating.[7] (*Id.*) In response, "the captain threatened and racially stereotyped Plaintiff as being a gang member" and Jane Doe # 3 stated, "You are going to see what's going to happen to you F*** spic," and dispatched the "special unit," a team of officers consisting of John Does # 4, 5 and 6. (*Id.* at 11.) The "special unit" was "sent by Jane Doe # 3 in retaliation" for Plaintiff's offer to translate during the argument between Jane Doe # 3 and the inmate. (*Id.* at 10.)

When the "special unit" arrived, the officers took Plaintiff to his cell and ordered him to remove all of his clothes while Plaintiff stood in front of a window through which other inmates

---

[7] It is not clear from the allegations whether Jane Doe # 3 and the "captain" are the same person or two different people. (Am. Compl. 10.)

6

were able to see Plaintiff.  (*Id.* at 11.)  Plaintiff alleges that, as a result of the strip search, he was "humiliated and scared for his life" because one of the special unit officers stated, "I was sent here to handle business."  (*Id.*)  Plaintiff "quickly and intelligently diffused the situation" such that the officers left Plaintiff's cell without harming Plaintiff.  (*Id.* at 11.)  The officers' "outrageous intentional actions" have nonetheless caused Plaintiff to be "traumatized and nervous around officers."[8]  (*Id.*)

## II. Discussion

### a. Standard of review

A complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  In reviewing a *pro se* complaint, the court must be mindful that the plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks omitted); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (same); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even

---

[8]  Plaintiff alleges that, following the strip search, Plaintiff called his brother, David Lopez, and directed him to file a complaint with 311 regarding the strip search.  (Am. Compl. 11.)  Plaintiff's brother filed a complaint with 311 as requested, and attached to the Amended Complaint is an October 12, 2012 email from the 311 Customer Service Center confirming receipt of the complaint and forwarding it to DOC.   (Ex. E annexed to Am. Compl. at ECF No. 28–29.)  Plaintiff also alleges that three days after the strip search occurred, on October 15, 2012, he was transferred to Ulster County Correction Facility and, as a result, Plaintiff "wasn't able to grieve" the "malicious actions" of John Does # 4, 5 and 6.  (Am. Compl. 11.)

after *Twombly*, the court "remain[s] obligated to construe a *pro se* complaint liberally").

Nevertheless, the Court is required to dismiss *sua sponte* an *in forma pauperis* action if the Court

determines it "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be

granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28

U.S.C. § 1915(e)(2)(B); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007).[9]

### b. Section 1983 claims

Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against Zouvelos, Conwell and the

City for alleged violations of Plaintiff's rights under the Fourth, Fifth, Eighth and Fourteenth

Amendments. Although not named in the caption of his Amended Complaint, Plaintiff appears

to allege violations of his rights by Jane Doe # 3 and John Does # 4, 5 and 6.

In order to sustain a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege (1)

that the challenged conduct was "committed by a person acting under color of state law," and (2)

that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the

Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010)

(quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Section 1983 claims generally

must be brought against the individuals personally responsible for the alleged deprivation of

constitutional rights, not against the government entities or agencies where those individuals are

---

[9] When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (documents attached to the complaint, those incorporated by reference, and those integral to the complaint); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records). If the court takes judicial notice of public records, it does so "in order to determine what statements they contained[,] but not for the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (alteration, citation and internal quotation marks omitted).

employed. *See Thomas v. Ashcroft*, 470 F.3d 491, 496–97 (2d Cir. 2006). A plaintiff seeking to recover money damages "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 678. Furthermore, "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mt. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation and internal quotation marks omitted).

### i. Under color of state law — Zouvelos and Conwell

In order to state a claim pursuant to Section 1983 against a private individual like Zouvelos or Conwell, the under-color-of-state-law element must be satisfied by alleging the challenged conduct constituted "state action." *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001) ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes.")); *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) ("In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment.")).

A private actor engages in state action when his or her conduct is "fairly attributable to the state." *Filarsky v. Delia*, 566 U.S. ---, ---, 132 S. Ct. 1657, 1661–62 (2012); *see Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 188 (2d Cir. 2009) ("Under § 1983, state action may be found when there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." (internal quotation marks omitted) (quoting *Brentwood Acad.*, 531 U.S. at 295)). The conduct of a private actor may be attributed

to the state, satisfying the state action requirement, when:

> (1) the State compelled the conduct [the "compulsion test"], (2) there is a sufficiently close nexus between the State and the private conduct [the "close nexus test" or "joint action test"], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the "public function test"].

*McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1703 (2015); *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008). Each of the three avenues requires a fact-specific inquiry into the challenged conduct, and in order to find state action, a court must determine that the specific activity claimed to have caused the injury giving rise to a plaintiff's claim can fairly be deemed that of the state. *See Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 265 (2d Cir. 2014) (examining public function test, noting that the function performed by the private entity must have historically been "an exclusive prerogative" of the state (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 159 (1978))); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491–92 (2d Cir. 2009) (examining joint action test, noting that state action cannot be premised solely on subjection to state regulation, funding, licensing or even state creation); *Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F. Supp. 2d 340, 349–50 (E.D.N.Y. 2013) (examining compulsion test).

Below, the Court considers the sufficiency of all conceivable allegations as to each test.[10]

---

[10] According to Plaintiff, Zouvelos' involvement in his apprehension was limited to directing Conwell to take Plaintiff into custody. However, for purposes of assessing the sufficiency of the allegations as to Zouvelos and Conwell, the Court assumes that, if Zouvelos and Conwell were found to be state actors, Zouvelos could be liable for the unlawful conduct of Conwell and the agents under his supervision as a "supervisory defendant" who "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom" or "was grossly negligent in supervising subordinates who committed the wrongful acts." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

### 1.  Close nexus or joint action test

Under the close nexus or joint action test, the requisite nexus between the State and the challenged conduct exists "where a private actor has operated as a willful participant in joint activity with the State or its agents, or acts together with state officials or with significant state aid." *Abdullahi*, 562 F.3d at 188 (internal citations and quotation marks omitted); *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) ("A private person — not a government official — acts under color of state law for purposes of § 1983 when 'he has acted together with or has obtained significant aid from state officials' . . . ." (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982))).  "It is not enough, however, for a plaintiff to plead state involvement in some activity of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." *Sybalski*, 546 F.3d at 258 (emphasis, internal quotation marks and citations omitted).

Plaintiff appears to rely almost exclusively on the close nexus or joint action test to allege that Zouvelos and Conwell engaged in state action.  Plaintiff asserts the requisite nexus exists on the basis of state regulation, Fourth Circuit precedent regarding the state action requirement in the particular context of bail bondsmen, and on the basis of allegations that sound in conspiracy. The Court considers each of Plaintiff's arguments.

### A.  State regulation

As evidence of a nexus between Zouvelos and Conwell and the State of New York, Plaintiff asserts that bondsmen are licensed by the State and that the State is the source of their

authority to supervise and apprehend fugitives.[11]  (Pl. Mem. in Opp'n to Mots. to Dismiss ("Pl. Opp'n Mem.") 4, Docket Entry No. 38.)  In particular, Plaintiff emphasizes a statutory provision under the New York General Business Law that requires bail enforcement agents like Conwell to notify the local police precincts with jurisdiction over the area where a fugitive is believed to be located before attempting to take the fugitive into custody.[12]  (*Id.* at 4–5.)  Plaintiff appears to make two arguments as to why the notification requirement transforms Zouvelos' and Conwell's otherwise private action into state action.  First, Plaintiff asserts that because State law imposed this procedural requirement on Plaintiff's apprehension, and because Conwell followed the requisite procedure in apprehending Plaintiff, there is a nexus between the challenged conduct and the State.  (*Id.* at 4, 6.)  Second, Plaintiff asserts that the notification requirement is significant because John Doe # 2 "authorized" Conwell to proceed with taking Plaintiff into

---

[11]  With respect to the apprehension of fugitives, the applicable section of the New York Code of Criminal Procedure provides, in relevant part:

> At any time before the forfeiture of a bail bond, an obligor may surrender the defendant . . . to the court in which his case is pending or to the sheriff to whose custody he was committed at the time of giving bail . . . .  For the purpose of surrendering the defendant, an obligor or the person who posted cash bail for the defendant may take him into custody at any place within the state, or he may, by a written authority indorsed on a certified copy of the bail bond, empower any person over twenty years of age to do so.

N.Y. Crim. Proc. Law § 530.80.

[12]  The provision requiring notice states, in relevant part:

> Prior to taking or attempting to take into custody a person, a bail enforcement agent shall notify a local law enforcement agency having jurisdiction over the area in which the person is believed to be located of such bail enforcement agent's intentions.  The notification shall be provided on a form prescribed by the local law enforcement agency . . . .  A representative of a local law enforcement agency may accompany a bail enforcement agent when the bail enforcement agent enters what is believed to be an occupied structure to search for or to apprehend a person.

N.Y. Gen. Bus. Law § 74-a.

custody which establishes assistance from, and joint action with, a state actor. (*Id.* at 4–5 ("The 'Consent or Authorization' by the 83rd Precinct commanding officer to allow the bondsmen to unlawfully arrest Mr. Lopez, signifies 'aid' and results in liability against the state. . . . [T]here is a procedure Zouvelos and Conwell go by before they arrest their bailees with the police department, resulting in a special relationship between the two.").)

Accepting these allegations as true, they are not sufficient to allege state action. Merely establishing that a private entity is subject to extensive state regulation or is "affected with the public interest" is not sufficient to allege that the entity's conduct constitutes state action. *Cooper*, 577 F.3d at 491–92 ("A finding of state action may not be premised solely on the private entity's creation, funding, licensing, or regulation by the government." (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003))). Similarly, the fact that the challenged conduct is subject to a permissive regulatory scheme that requires adherence to certain procedures or permission from state actors is not sufficient. *Cranley*, 318 F.3d at 112–13 (state action not shown on basis of state insurance law permitting companies to reorganize provided that they follow certain procedures and obtain state insurance commissioner's approval of reorganization plan, approval from commissioner did not establish state's participation in plan, because "[a]ction taken by private entities with the mere approval or acquiescence of the state is not state action"); *Sybalski*, 546 F.3d at 259 (upholding dismissal of § 1983 claims challenging limitations imposed by group home staff on resident's visits with family; although state regulations established the procedures whereby staff imposed the challenged limitations, there was no joint action with state because group home staff decided whether to impose such limitations).

Although state law imposed certain procedural requirements on Zouvelos and Conwell

should they elect to take Plaintiff into custody, neither state law nor John Doe # 2 or any other state actor *required* Zouvelos or Conwell to take Plaintiff into custody. This is not sufficient to establish joint action or affirmative cooperation. *See Weaver v. James Bonding Co., Inc.*, 442 F. Supp. 2d 1219, 1227 (S.D. Ala. 2006) ("[P]laintiff suggests that bail bondsmen can and should be held liable 'merely on the grounds that they had to get a [bondsman's process] before arresting the decedent.' But this is not an accurate summation of the law. There do not appear to be any cases holding that simply getting a state's permission to act transforms a private party into a state actor for § 1983 liability." (citation omitted)).

## B. Bail bondsmen

Plaintiff relies on Fourth Circuit precedent about bail bondsmen and urges the Court to conclude that Zouvelos and Conwell engaged in state action based on the "interdependen[t]" relationship between bail bondsmen like Zouvelos and Conwell and the City. (Pl. Opp'n Mem. 5 (citing *Jackson v. Pantazes*, 810 F.2d 426 (4th Cir. 1987)).) While several courts of appeal in other circuits have considered whether bail bondsmen and bail enforcement agents[13] are state

---

[13] As the cases involve not only bail bondsmen but also "bail enforcement agents" and bounty hunters, it is helpful to understand the differences between each of these actors. Where bail is set and a defendant awaiting trial is unable to post the full amount, the defendant may enlist the services of a third-party bail bondsman, or "surety," who is typically either the operator or agent of a commercial bail bond business. *See* 8 C.J.S. Bail § 150; Gerald D. Robin, *Reining in Bounty Hunters*, 21-Fall Crim. Just. 4, 4 (2006); Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L. Rev. 731, 742 (1996). The bail bondsman secures the release of the defendant, or "principal," by endorsing a bail bond on the defendant's behalf whereby the bonding company guarantees the defendant's appearance in court and agrees to pay the full value of the bond should the defendant principal fail to appear. *See* 8 C.J.S. Bail § 151 ("A recognizance or bail bond, being in essence a contract agreement between the government and the surety and the defendant who is the principal . . . .").

If a principal fails to appear in court, the bondsman will be liable for the full value of the bond unless he is able to deliver the principal to court before a specific date. *See* 8 C.J.S. Bail § 150; Robin, 21 Fall Crim. Just. at 4. At this juncture, in order to avoid forfeiture, the bondsman

actors such that their conduct in apprehending fugitives may give rise to liability under Section 1983, the Second Circuit has not addressed this precise issue. The majority of circuits that have considered this issue have focused on whether the bondsmen enlisted the assistance of law enforcement officers in arresting their principals and, in the absence of allegations that law enforcement officers provided affirmative assistance or joined bondsmen in effecting the apprehension as joint actors, these courts have not found state action. *See McGregor v. Snyder*, 427 F. App'x 629, 633 (10th Cir. 2011) (no state action); *Dean v. Olibas*, 129 F.3d 1001, 1003, 1005–06 (8th Cir. 1997) (same); *Landry v. A-Able Bonding, Inc.*, 75 F.3d 200, 204–05 (5th Cir. 1996) (same); *Ouzts v. Maryland Nat. Ins. Co.*, 505 F.2d 547, 552–53 (9th Cir. 1974) (same); *see also United States v. Poe*, 556 F.3d 1113, 1123–24, 1124 n.14 (10th Cir. 2009) (finding bounty hunter was not state actor for purposes of Fourth Amendment search and seizure, and noting that result would be the same for state action element of § 1983 claim because same test applies in both Fourth Amendment and § 1983 contexts). However, in *Jackson*, the Fourth Circuit held otherwise and determined that, as a general matter, bail bondsmen are state actors for purposes of Section 1983. *Jackson*, 810 F.2d at 429–30.

In his opposition, Plaintiff relies on *Jackson* and urges the Court to find that Zouvelos and Conwell engaged in state action pursuant to this precedent. (Pl. Opp'n Mem. 5.) In *Jackson*, the Fourth Circuit held that, given the "symbiotic relationship" between bondsmen and the criminal court system, the conduct of bail bondsmen is categorically state action, regardless of

---

will either attempt to apprehend the fugitive principal himself or he will enlist bail enforcement agents or bounty hunters to do so. *See* Robin, *supra* at 4; Drimmer, *supra* at 743; *see also* N.Y. Gen. Bus. Law § 71(1-a) (defining "bail enforcement agent" as a person or company engaged "in the business of enforcing the terms and conditions of a person's release from custody on bail in a criminal proceeding, including locating, apprehending and returning any such person released from custody on bail who has failed to appear at any stage of a criminal proceeding to answer the charge before the court in which he may be prosecuted.").

the facts and circumstances of a particular case. *Jackson*, 810 F.2d at 430 ("[T]he symbiotic relationship between bail bondsmen and the Maryland criminal court system suffices to render [the bond surety defendant's] conduct state action. Bondsmen depend, for their livelihood, upon the judicial use of a bail bond system, and they are licensed by the state. In return, bondsmen facilitate the pretrial release of accused persons, monitor their whereabouts and retrieve them for trial."); *see also Gregg v. Ham*, 678 F.3d 333, 339 n.3 (4th Cir. 2012) (holding that conduct of bondsman constituted state action based on *Jackson*). Plaintiff, relying on this standard, asserts that "the symbiotic relationship between Zouvelos, Conwell and the City suffices to render bondsmen's conduct state action." (Pl. Opp'n Mem. 5.)

The Fifth, Eighth, Ninth and Tenth Circuits have rejected the "symbiotic relationship" approach taken in *Jackson*. *See Poe*, 556 F.3d at 1124 ("[The] argument that law enforcement and the bail bonds industry have a 'symbiotic relationship' is unpersuasive." (internal citation omitted)); *Dean*, 129 F.3d at 1006 n.4 ("We reject [the Fourth Circuit 'symbiotic relationship' approach] . . . . As a general matter, bondsmen are private citizens who interact with the state in the course of pursuing their private interests. Their conduct is therefore not attributable to the state." (internal citations and quotation marks omitted)); *Landry*, 75 F.3d at 205 n.5 ("We are not persuaded by the Fourth Circuit's finding that the relationship between bail bondsmen and the state criminal court system is such that the actions of the bondsmen may be fairly treated as that of the state itself."); *Ouzts*, 505 F.2d at 554–55 (rejecting assertion that "bondsman was acting as an unofficial agent or partner" of the court and was, therefore, "clothed with some of the court's official authority" because a "bail bondsman is in the business in order to make money and is not acting out of a high-minded sense of devotion to the administration of justice").

In contrast to the Fourth Circuit approach, the Fifth, Eighth, Ninth and Tenth Circuits

consider each individual case to determine the extent to which bondsmen acted together with, or received significant aid from, local police officers in apprehending fugitives based on the particular facts and circumstances of a given case.  Under the approach in these circuits, state action in the context of bail bondsmen depends on the affirmative assistance and participation of local police in a bondsman's efforts to apprehend a fugitive, and state action is not found unless significant, affirmative assistance or joint action is alleged.  *See McGregor*, 427 F. App'x at 633 (affirming grant of summary judgment in favor of bounty hunter in § 1983 claim because bounty hunter "was not functioning as a state actor" when, during pursuit of fugitive, he went to plaintiff's home unescorted by police and attempted to gain entry); *Dean*, 129 F.3d at 1003, 1005–06 (finding bail bondsman who filed affidavit regarding his intention to surrender principal did not engage in state action where police officers' subsequent arrest of principal was pursuant to warrant based on bondsman's affidavit because bondsman "filed [the affidavit] on his own and of his own free will, without the aid or encouragement of the state"); *Landry*, 75 F.3d at 204–205 (finding bail bondsman's seizure of plaintiff did not constitute state action because bondsman "did not attempt to enlist the assistance of local law enforcement officials"); *Ouzts*, 505 F.2d at 552–53 (finding out-of-state bounty hunter who arrested principal in violation of California law was not state actor because state action requires "state involvement which directly or indirectly promote[s] the challenged conduct"); *see also Poe*, 556 F.3d at 1118, 1123–24 (holding bounty hunters did not engage in state action when, after observing illegal narcotics in criminal defendant's home during apprehension, bounty hunters called police who responded to scene and arrested defendant; bounty hunters were not state actors for purposes of the Fourth Amendment because police had not "instigated, orchestrated or encouraged the search" and bounty hunters intent was not to assist law enforcement but rather to protect their own financial interests);

*Weaver*, 442 F. Supp. 2d at 1229 (finding bail bondsman was not engaged in state action and could not be liable under § 1983 "for bail bonding function performed unilaterally, without assistance or cooperation from law enforcement agents, and in furtherance of its own private financial and contractual interests"); *Green v. Abony Bail Bond*, 316 F. Supp. 2d 1254, 1261 (M.D. Fla. 2004) (finding bondsmen did not engage in state action when they assaulted plaintiffs while attempting to arrest principal because state law enforcement officers were not present at the scene and "[a]lthough [bondsmen's] authority to arrest . . . derived from the State of Florida . . . [there were no] allegations indicating [bondsmen] received instructions, directions, aid, comfort, succor, or anything else from the State in pursuing their principal"); *cf. Tirreno v. Mott*, 453 F. Supp. 2d 562, 568 (D. Conn. 2006) (finding bondsman and bail enforcement agent acted together with, and received significant aid from, local police in searching plaintiffs' home in pursuit of principal where officers were present at the scene during search and facilitated access by advising plaintiffs that bondsman and bail enforcement agent had "special rights" to enter plaintiffs' house and threatening to kill plaintiffs' dog if plaintiffs continued to refuse entry).

Although the Second Circuit has not considered the precise issue of the state action requirement as it applies to the activities of bondsmen, the Second Circuit's analysis in *Barrett v. Harwood*, 189 F.3d 297 (2d Cir. 1999), is instructive. In *Barrett*, the Court assessed the sufficiency of the plaintiffs' due process claims pursuant to Section 1983 based on the repossession of plaintiffs' truck by a private repossession agent. *Id.* at 300. In preparing to repossess the truck, the private agent contacted the local police and requested that an officer be dispatched to the scene, and the responding officer stood next to the truck during the repossession. *Id.* at 299, 303. Although it was undisputed that the officer "did not physically

18

assist [the repossession] process," when the defaulting purchaser struck the repossession agent, the officer came forward and warned him: "If you start any trouble here, you'll be going in the back seat of my car." *Id.* at 299. The Court stated that, in order to determine whether the private agent's conduct in effecting the repossession constituted state action, it was necessary to identify the "point at which an officer's presence and activities at the scene of a repossession become state action in aid of the repossession." *Id.* at 302.

Considering relevant case law from several circuits, the Second Circuit "discern[ed] a spectrum of police involvement" that ranged from *de minimis* involvement not amounting to state action at one end in cases where an officer is merely present at the scene, to cases further along the spectrum where an officer is present and intervenes to keep the peace but is still not sufficiently involved to give rise to state action, and, finally, to cases at the opposite end of the spectrum where an officer "begins to take a more active hand in the repossession, and . . . becomes increasingly critical" such that the repossession takes on the character of state action. *Id.* at 302. The Court held that "the crucial question is whether the police officer was (1) present simply to stand by in case there was a breach of the peace, or (2) taking an active role that either affirmatively assisted in the repossession over the debtor's objection or intentionally intimidated the debtor so as to prevent him from exercising his legal right to object to the repossession." *Id.* at 302–03. Because the officer in *Barrett* was present solely to keep the peace and did not engage in any affirmative conduct to assist with the repossession, the Court found that his involvement did not rise to the level of joint activity or significant assistance and was, therefore, not state action. *Id.* at 303; *see Dolan v. Cassella*, 543 F. App'x 90, 91–92 (2d Cir. 2013) (finding repossession did not involve state action on basis of *Barrett*).

The Court finds the approach taken by the Fifth, Eighth, Ninth and Tenth Circuits

persuasive, particularly in view of the fact that their approach is consistent with that of the Second Circuit in *Barrett*. The Court therefore declines to apply the approach taken by the Fourth Circuit in *Jackson*.[14] Based on the Second Circuit's analysis in *Barrett* and in light of the bondsmen-specific precedent from the Fifth, Eighth, Ninth and Tenth Circuits applying the joint action test, the Court concludes that the allegations here are insufficient to state a plausible basis for state action as to Zouvelos or Conwell.

It is undisputed that no officer from the 83rd Precinct or any other state actor was present when Conwell and the agents under his supervision "invaded Plaintiff's home by 'hostile takeover'" and engaged in the conduct that is alleged to have caused the injuries Plaintiff attributes to Zouvelos and Conwell. (Am. Compl. 8.) Where no law enforcement officer or state actor was present at the scene of Plaintiff's apprehension, and no affirmative assistance from John Doe # 2 or another state actor is otherwise alleged — apart from the "authorization" provided by John Doe # 2 at the outset which, as discussed above, does not give rise to state action — there is no basis to conclude that Zouvelos and Conwell acted jointly with, or obtained significant assistance from, a state actor in the course of taking Plaintiff into custody. Indeed, the allegations here are essentially concerned with John Doe # 2's inaction — on the basis of John Doe # 2's failure to review John Doe # 1's report and to escort Conwell to Plaintiff's home — and, as such, the allegations are insufficient to state a claim against Zouvelos or Conwell.

---

[14] The Second Circuit's disinclination to rely on the "symbiotic relationship" test also informs the Court's decision. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 314 n.8 (2d Cir. 2007) (noting that the "symbiotic relationship test" was established by *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), which was "one of the Warren Court cases that took an expansive view of state action" and that, "[a]lthough neither *Burton* nor the symbiotic relationship doctrine has been overruled, they have been severely narrowed in scope and diminished as precedent." (quoting 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.13[A], at 5–90–5–91 (4th ed. 2003))), *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008).

Plaintiff has thus failed to establish state action through the close nexus or joint action tests based on the conduct of Zouvelos or Conwell and their status as bail bondsmen.

## C. Conspiracy

Although the Amended Complaint is unclear, Plaintiff appears to allege conspiracies between Conwell and John Doe # 2 of the 83rd Precinct, and between Conwell and DOC correction officer John Doe # 3.

A private party will be shown to have acted under the color of state law if the party conspires with the government to deprive a plaintiff of his constitutional rights. *Missere v. Gross*, 826 F. Supp. 2d 542, 567 (S.D.N.Y. 2011) ("The touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the [state actor]." (citations omitted)). To plead a conspiracy for purposes of satisfying the state action requirement, a plaintiff must adequately allege the same elements that are required to state a conspiracy claim under Section 1983. *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002); *Young v. Suffolk Cty.*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010) ("[I]f the plaintiff has sufficiently pled the existence of joint activity by the County defendants and the private party defendants or sufficiently alleged that there was a conspiracy between the private party defendants and the County defendants under § 1983, she will have sufficiently alleged state action by the private party defendants."). The elements of conspiracy under Section 1983 are "1) 'an agreement between the state [actor] and private party,' 2) 'to act in concert to inflict an unconstitutional injury,' and 3) 'an overt act done in furtherance of the goal causing damages.'" *Sclafani v. Spitzer*, 734 F. Supp. 2d 288, 297–98 (E.D.N.Y. 2010) (citing *Ciambriello*, 292 F.3d at 324–25). "[A] Section 1983 conspiracy claim against a private individual requires more than pleading simply, and in conclusory fashion that the defendant 'conspired' with state actors."

*Stewart v. Victoria's Secret Stores, LLC*, 851 F. Supp. 2d 442, 445 (E.D.N.Y. 2012) (citing

*Ciambriello*, 292 F.3d at 324). "[While] [a] plaintiff is not required to list the place and date of

defendants['] meetings and the summary of their conversations when he pleads conspiracy, . . .

the pleadings must present facts tending to show agreement and concerted action." *Young*, 705

F. Supp. 2d at 197 (alteration in original) (citations omitted).

Plaintiff alleges John Doe # 2 "authorized Conwell to illegally arrest Plaintiff, without

inquiring into the basis of the bondsm[en's] claim before acting in concert." (Am. Compl. 7.)

To the extent Plaintiff intends to allege a conspiracy between Conwell and John Doe # 2 as the

basis for state action, the allegations are insufficient. Plaintiff has not alleged an agreement

between Conwell and John Doe # 2 and, instead, Plaintiff vaguely claims Conwell and John

Doe # 2 acted "in concert" pursuant to an unspecified agreement without setting forth sufficient

non-conclusory, factual allegations to support this claim. (*Id.* at 7–8); *see Ciambriello*, 292 F.3d

at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor

does not suffice to state a § 1983 claim against the private entity."); *see also Betts v. Shearman*,

751 F.3d 78, 84 n.1, 86 (2d Cir. 2014) (upholding dismissal of § 1983 claims on basis of, *inter

alia*, failure to sufficiently plead conspiracy and joint action with state actors where plaintiff

claimed police officers assisted and coached private individual in making a false statement,

allegations were conclusory and implausible); *Jae Soog Lee v. Law Office of Kim & Bae, PC*,

530 F. App'x 9, 10 (2d Cir. 2013) (upholding dismissal of § 1983 claim because complaint

lacked "allegations, made in a non-conclusory way, setting out the overt acts, and the agreement,

that allegedly comprised the conspiracy" and, as such, there were "simply not enough factual

allegations to set out an actionable claim that defendants acted under color of state law");

*Harrison v. New York*, No. 14-CV-1296, 2015 WL 1413359, at *19–20 (E.D.N.Y. Mar. 20,

2015) (discussing heightened pleading standard applicable to § 1983 conspiracy claims, heightened standard is necessary because such claims are "so easily made and can precipitate such protracted proceedings with such disruption of governmental functions that detailed fact pleading is required to withstand a motion to dismiss" (quoting *Angola v. Civiletti*, 666 F.2d 1, 4 (2d Cir. 1981) (internal quotation marks omitted))); *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 551 (S.D.N.Y. 2014) (dismissing § 1983 conspiracy claim because, although plaintiff claimed private individuals and state actor conspired through emails, faxes, phone calls and during in-person visits, plaintiff failed to provide "details about these calls or visits").

Plaintiff also claims that, when he was admitted to Rikers Island, he heard correction officer John Doe # 3 say to Conwell "I'm going to charge you a fee for each body brought in." (Am. Compl. 9.) Plaintiff appears to allege that this statement evidences a conspiracy among Conwell and, ostensibly, John Doe # 3 to "'obstruct justice' and hold Plaintiff against his will," because "Conwell's frivolous paperwork was accepted and the intake officer never thought to confirm [that] Plaintiff was an actual fugitive from justice with the court." (*Id.*) These allegations are similarly insufficient to allege a plausible conspiracy. The allegations are conclusory and unclear as to who exactly Plaintiff claims was part of the conspiracy. To the extent Plaintiff intends to allege a conspiracy between Conwell or Zouvelos and John Doe # 3 to enrich themselves through invalid bail revocations, there are no allegations offered as evidence of such a conspiracy aside from Plaintiff's own arrest which he does not dispute was made pursuant to a bench warrant, albeit an allegedly invalid warrant.

Plaintiff therefore fails to plead a conspiracy between Zouvelos or Conwell and a state actor and, accordingly, Plaintiff cannot rely on this theory to establish that Zouvelos and Conwell were acting under color of state law.

### 2. Compulsion test

Plaintiff does not appear to rely on the compulsion test and has not alleged any facts to suggest Zouvelos or Conwell were compelled, either by a state actor or under state law, to engage in the alleged conduct. However, to the extent Plaintiff did intend to rely on the compulsion test on the basis of the New York laws pertaining to bail bondsmen and bail enforcement agents discussed above, these laws are not sufficient to establish compulsion.

"Under the 'state compulsion' test, the existence of state action 'requires that a state exercis[e] coercive power or . . . provide such significant encouragement, either overt or covert, that the [decision] must in law be deemed that of the State.'" *Miller v. Bd. of Managers of Whispering Pines at Colonial Woods Condo. II*, 457 F. Supp. 2d 126, 130 (E.D.N.Y. 2006) (quoting *Archer v. Econ. Opportunity Comm'n of Nassau Cty. Inc.*, 30 F. Supp. 2d 600, 605 (E.D.N.Y. 1998)). The fact that state law merely permits the challenged conduct is not sufficient to establish state compulsion. *See McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (upholding dismissal of claim against private hospital and its employees based on plaintiff's involuntary commitment, and finding fact that state regulation provides legal framework under which physicians "may" involuntarily commit patients was insufficient to establish state compulsion because regulatory scheme permitted, but did not require, involuntary commitment), *cert. denied*, 135 S. Ct. 1703 (2015); *Cranley*, 318 F.3d at 112 ("Nor is a private entity a state actor where its conduct is not compelled by the state but is merely permitted by state law." (citing *Flagg Bros.*, 436 U.S. at 164–66)).

### 3. Public function test

The allegations are also insufficient to establish state action on the basis of the public function test. *See Grogan*, 768 F.3d at 265 (examining public function test, noting that the

function performed by the private entity must have historically been "an exclusive prerogative" of the state (quoting *Flagg Bros.*, 436 U.S. at 159)). The "public function" standard is strict and is not satisfied where a private party merely utilizes powers that are coextensive with those of the State; rather the private party must be shown to have utilized powers "traditionally the exclusive prerogative of the State." *Grogan*, 768 F.3d at 265 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982)); *Turturro v. Cont'l Airlines*, 334 F. Supp. 2d 383, 396 (S.D.N.Y. 2004). As the law has long-recognized a surety's right to apprehend a fugitive principal, the power to arrest in such circumstances was not historically the "exclusive prerogative" of the State. *See Taylor v. Taintor*, 83 U.S. 366, 371 (1872) ("Whenever they choose to do so, [sureties] may seize [a fugitive principal] and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent."); *United States v. Hollender*, No. 01-1350, 2001 U.S. App. LEXIS 20133, at *4 n.2 (2d Cir. Aug. 16, 2001) (noting that *Taylor* describes "the traditional role of a bondsman"); *see also Green*, 316 F. Supp. 2d at 1260 ("[H]istory indicates that bail bonding has never been an exclusive privilege of the sovereign. Rather, since the inception of the American legal system, bail was administered by private citizens and businessmen."). Therefore, the conduct of bondsmen cannot be shown to constitute state action on the basis of the public function test.

Because the allegations fail to sufficiently allege the threshold state action requirements as to Zouvelos and Conwell under any of the applicable tests, Plaintiff has failed to state a claim pursuant to Section 1983 as to Zouvelos and Conwell. Therefore, the Court grants Zouvelos' motion to dismiss the Amended Complaint as to him and *sua sponte* dismisses the Amended Complaint as to Conwell.

### ii.    False arrest claim

Plaintiff alleges he was arrested in violation of the Fourth Amendment.  The City asserts that Plaintiff fails to state a claim because (1) his arrest was supported by probable cause, regardless of whether the warrant was erroneously reflected on the computer system, and (2) Plaintiff cannot invoke the collective knowledge doctrine to negate probable cause based on the alleged report prepared by John Doe # 1.  (City Mem. 7–9.)

In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred.  *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007).  To prevail on a false arrest claim under New York law, a plaintiff must prove: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims).  "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'"  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19–20 (citing *Weyant*, 101 F.3d at 852, for probable cause analysis).  "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]'"  *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant,* 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir.

2013) (same).

Plaintiff asserts that his arrest was not supported by probable cause because he was arrested pursuant to an "erroneous warrant" that did not exist and only appeared to be outstanding on the New York State court website due to clerical error. However, accepting these allegations as true, they are insufficient to negate probable cause as officers are entitled to rely on computer databases tracking open warrants and such reliance is reasonable even where the records erroneously reflect warrants that are not actually outstanding. *See United States v. Miller*, 265 F. App'x 5, 7 (2d Cir. 2008) ("When an officer learns from a computer database . . . that a person is the subject of an outstanding arrest warrant, probable cause exists to arrest that person."); *United States v. Santa*, 180 F.3d 20, 27 (2d Cir. 1999) (concluding that "arresting officers' reliance on the [statewide police information computer database] record to arrest Santa was objectively reasonable" even though the warrant was invalid); *United States v. Towne*, 870 F.2d 880, 884–85 (2d Cir. 1989) (finding officer's reliance on fugitive warrant erroneously kept in "active" file was justified notwithstanding fact that defendant's parole officer told officer she suspected charges had been resolved); *Miller v. City of New York*, No. 11-CV-6663, 2012 WL 2524248, at *4 (S.D.N.Y. June 26, 2012) (finding warrant check system's report of outstanding warrants established probable cause and defeated claim for false arrest).

Plaintiff asserts that, because John Doe # 1 determined the warrant reflected on the system was erroneous two days prior to Plaintiff's arrest, John Doe # 1's knowledge as to the warrant's lack of validity should be imputed to the 83rd Precinct, and John Doe # 2 in particular, to negate probable cause. (Pl. Opp'n Mem. 7–8.) The City claims the "collective knowledge doctrine" on which Plaintiff relies is inapplicable because Plaintiff has not alleged any facts suggesting John Doe # 1 and John Doe # 2 were in communication with each other. (City Reply

Mem. in Support of Mot. to Dismiss ("City Reply Mem.") 4–5, Docket Entry No. 44.)

"The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, "where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all." *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)). The doctrine is based on the rationale that, "in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *Spears v. City of New York*, No. 10-CV-03461, 2012 WL 4793541, at *6 (E.D.N.Y. Oct. 9, 2012) (citations and internal quotation marks omitted); *see Colon*, 250 F.3d at 135; *Zaniewska v. City of New York*, No. 11-CV-2446, 2013 WL 3990751, at *5 (E.D.N.Y. Aug. 5, 2013).

The collective knowledge doctrine applies to officers who are working on the same case together, and does not support the broader proposition "that all information received by a police department . . . must be imputed to every officer in the department." *Santa*, 180 F.3d at 28. As such, the doctrine may not be invoked to establish "that facts known to some members of the police force which exonerate an arrestee are *ipso facto* imputed to the arresting officer." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986). Rather, there must be some showing of communication between the officers involved. *See United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987) ("The determination of whether probable cause to arrest exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts because the various law enforcement officers in this investigation were in communication with each other."); *Toliver v. City of New York*, No. 10-CV-3165, 2012 WL 7782720, at *6 (S.D.N.Y. Dec. 10, 2012) ("The

[collective knowledge] doctrine applies if the officers involved are in communication with each other."), *report and recommendation adopted*, No. 10-CV-3165, 2013 WL 1155293 (S.D.N.Y. Mar. 21, 2013); *Wong v. Yoo*, 649 F. Supp. 2d 34, 60 n.11 (E.D.N.Y. 2009) ("[*S*]*ome* amount of communication between officers is necessary in order for a second officer's reliance on the first officer's knowledge to be reasonable."); *Celestin v. City of New York*, 581 F. Supp. 2d 420, 430 n.6 (E.D.N.Y. 2008) ("The collective knowledge doctrine also requires that the officers were in communication with each other.").

While Plaintiff alleges that both John Doe # 1 and John Doe # 2 were members of the 83rd Precinct, at the time of Plaintiff's arrest, John Doe # 1 is alleged to have been a member of the "warrant squad," whereas John Doe # 2 is alleged to have been a commanding officer. (Am. Compl. 7.) Though Plaintiff claims the report prepared by John Doe # 1 "was easily retrievable by John Doe # 2, if reasonable measures were taken" there are no specific allegations as to the nature of the report and the basis for Plaintiff's claim that it was accessible to John Doe # 2. (*Id.* at 7–8.) Even crediting Plaintiff's allegations, the facts alleged are not sufficient to suggest application of the collective knowledge doctrine is warranted. The collective knowledge doctrine is premised on the propriety of imputing knowledge to each individual member of a group that is acting in concert such that there is a basis to presume the knowledge of each individual member is shared by the group. *See Santa*, 180 F.3d at 28 (recognizing that "imputation of knowledge from one police officer to another officer" pursuant to collective knowledge doctrine is warranted where "officers [are] working on the same case"). Here, Plaintiff claims that, when Zouvelos checked the New York State Courts online warrant records on the day of Plaintiff's arrest, the records still erroneously reflected an outstanding warrant for Plaintiff. (Am. Compl. 7.) At most, this establishes a basis to conclude that John Doe # 1 failed

to enter the "known report" on a database that would have triggered the correction of the online

records Zouvelos is alleged to have relied on.  (*Id.* at 7–8.)  There are no facts to support a

plausible inference that John Doe # 1 and John Doe # 2 were working and communicating with

one another such that the knowledge of one can be imputed to the other.  Because there was a

warrant for Plaintiff's arrest, there was probable cause defeating Plaintiff's false arrest claim.

### iii.   Eighth and Fourteenth Amendment claims

Plaintiff alleges his rights under the Eighth and Fourteenth Amendments[15] were violated

in two respects.  First, Plaintiff alleges that "the DOC fail[ed] to maintain a safe environment"

and he asserts a claim challenging the conditions of his confinement based on the defective

rubber mat at the BK Detention Center.  (*Id.* at 10.)  Second, Plaintiff alleges that, after he

sustained ankle and knee injuries — which Plaintiff claims were caused by the defective rubber

mat — he did not receive adequate medical treatment at the BK Detention Center.  (*Id.* at 4, 10.)

The City contends that Plaintiff fails to state a claim based on either the defective rubber

mat or the medical treatment Plaintiff received upon sustaining ankle and knee injuries because

---

[15]   Plaintiff does not specify whether, at the time when he sustained the alleged injuries at BK Detention Center, he had been convicted of a crime or was instead a pretrial detainee. Claims asserted by pretrial detainees arise under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979); *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) ("[A] person detained prior to conviction receives protection against mistreatment at the hands of prison officials under . . . the Due Process Clause of the Fourteenth Amendment if held in state custody."); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("Because as a pre-trial detainee she was not being 'punished,' the 'cruel and unusual punishment' proscription of the Eighth Amendment to the Constitution does not apply. . . .  [Plaintiff's] claims arise under the Due Process Clause . . . instead.").  However, the Second Circuit has held that "[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."  *Caiozzo*, 581 F.3d at 72; *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (same); *Liggins v. Griffo*, 356 F. App'x 537, 539 (2d Cir. 2009) (same). This distinction is, therefore, of no moment for purposes of analyzing the instant motions.

Plaintiff has, at most, alleged negligence which does not give rise to a constitutional violation. (City Mem. 15.)

### 1.  Conditions-of-confinement claim

To state a claim based on inadequate conditions of confinement, a plaintiff must allege that "(1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, . . . [prison officials acted with] deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).

In order to satisfy the objective prong of a claim based on conditions of confinement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."  *Walker*, 717 F.3d at 125 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  "[T]here is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'"  *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)).  Moreover, "conditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Walker*, 717 F.3d at 125 (citation and internal quotation marks omitted) (holding allegations were sufficient as to objective element where plaintiff alleged that "for approximately twenty-eight months, he was confined in a cell with five other men, with inadequate space and ventilation, stifling heat in the summer and freezing cold in the winter, unsanitary conditions, including urine and feces splattered on the floor, insufficient cleaning supplies, a mattress too

narrow for him to lie on flat, and noisy, crowded conditions that made sleep difficult and placed

him at constant risk of violence and serious harm from cellmates").

To satisfy the subjective, deliberate indifference prong, a plaintiff must establish that a

prison employee "knew of and disregarded an excessive risk to [the plaintiff's] health or safety

and that [the correctional employee] was both aware of facts from which the inference could be

drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo v.*

*Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (internal quotation marks, alterations and citation

omitted); *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (same); *see Nielsen v. Rabin*, 746

F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective

recklessness. This mental state requires that the charged official act or fail to act while actually

aware of a substantial risk that serious inmate harm will result." (quoting *Salahuddin v. Goord*,

467 F.3d 263, 280 (2d Cir. 2006))); *Lapierre v. Cty. of Nassau*, 459 F. App'x 28, 30 (2d Cir.

2012) ("The official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." (alteration omitted)

(quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *Salahuddin*, 467 F.3d at 280

("The reckless official need not desire to cause such harm or be aware that such harm will surely

or almost certainly result. Rather, proof of awareness of a substantial risk of the harm

suffices."). "[A]wareness may be proven 'from the very fact that the risk was obvious.'"

*Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Farmer*, 511

U.S. at 842 (1994))).

Here, Plaintiff has alleged only that the rubber mat was "deteriorated" and "had a non-

visible hole" and that the mat caused Plaintiff's knee and ankle injuries. (Am Compl. 10.) These

allegations are insufficient to establish a plausible basis to conclude that the rubber mat posed an

unreasonable risk of serious damage to Plaintiff's health. *See Jabbar*, 683 F.3d at 58 (holding allegations were insufficient to satisfy objective element in context of claim based on prison officials' failure to provide seatbelts for inmates in transport vans); *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 491 (S.D.N.Y. 2014) (holding plaintiffs failed to satisfy objective prong where plaintiffs alleged they were confined in "sewage-flooded cells for, at most, eight and a half hours"); *Youmans v. Schriro*, No. 12-CV-3690, 2013 WL 6284422, at *2 (S.D.N.Y. Dec. 3, 2013) (holding allegations insufficient as to objective prong where plaintiff claimed he suffered chiropractic injuries due to metal bed frames); *Ramirez v. City of New York*, No. 13-CV-3268, 2014 WL 3747178, at *4 (S.D.N.Y. July 28, 2014) (recommending dismissal of claim brought by inmate who alleged poor lighting and leak in bathroom created hazardous condition that caused him to slip and injure himself because plaintiff failed to plead "facts tending to show objectively that the lighting condition was a matter of urgency"), *report and recommendation adopted*, No. 13-CV-3268 (S.D.N.Y. Aug. 20, 2014).

Having failed to allege an excessive risk to inmate safety due to the rubber mat for purposes of the objective prong of his conditions-of-confinement claim, Plaintiff necessarily fails to satisfy the subjective, deliberate indifference element as well. *Jabbar*, 683 F.3d at 58 (holding deliberate indifference "cannot be plausibly alleged" where plaintiff failed to establish an excessive risk to inmates' safety for purposes of objective prong). However, even if Plaintiff had established that the rubber mat created an unreasonable safety risk, the allegations would still fail to establish deliberate indifference because Plaintiff does not allege BK Detention Center staff, or any other state actor, was aware of the mat's defective condition. Rather, Plaintiff alleges only that it "appears the [mats] were overlooked by the . . . contractors" involved in renovating BK Detention Center. (Am. Compl. 4.) This allegation is not sufficient to plausibly allege

deliberate indifference. *Compare Walker*, 717 F.3d at 129–30 (holding plaintiff sufficiently

alleged prison officials knew of and disregarded excessive risk to health and safety for purposes

of claim based on overcrowding and cleanliness of cells where plaintiff alleged he spoke with

officials about conditions and made complaints yet conditions did not change), *and Cano v. City*

*of New York*, 44 F. Supp. 3d 324, 333 (E.D.N.Y. 2014) (holding plaintiff satisfied deliberate

indifference element where plaintiff asserted claim based on inadequate conditions and alleged

prison officials were aware of conditions from, *inter alia*, internal reports, complaints filed by

detainees, media reports, and prior lawsuits and that, despite this awareness, officials failed to

remediate conditions and abate risk of harm), *with McCree v. Messina*, No. 14-CV-5201, 2015

WL 4299546, at *4 (S.D.N.Y. July 15, 2015) (dismissing plaintiff's claim based on conditions of

confinement and holding plaintiff failed to allege deliberate indifference because complaint did

not allege prison officials were aware of, or had any involvement with, the conditions about

which plaintiff complained).

Therefore, Plaintiff has not stated a claim based on the conditions of his confinement and

the defective rubber mat.

### 2.  Medical treatment claim

To state a claim based on inadequate medical treatment a plaintiff must sufficiently allege

(1) that he had an objectively "serious medical condition," and (2) that this condition was met

with subjective "deliberate indifference" on the part of prison officials. *Caiozzo*, 581 F.3d at 72

(quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)).

In order to satisfy the objective element, a plaintiff must establish a serious medical

condition by showing "that his medical need was 'a condition of urgency, one that may produce

death, degeneration, or extreme pain.'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005)

(quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Salahuddin*, 467 F.3d at 280 (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)).

As discussed *infra* with regard to Plaintiff's challenge to the conditions of his confinement, the subjective prong of Plaintiff's medical treatment claim, which requires a showing of deliberate indifference on the part of prison officials, is satisfied where a plaintiff establishes that a prison employee "knew of and disregarded an excessive risk to [the plaintiff's] health or safety and that [the correctional employee] was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo*, 581 F.3d at 72 (internal quotation marks, alterations and citation omitted).

Here, Plaintiff claims he "sustained a fracture to his right . . . ankle and [a] sprained knee" and that he suffered from "severe pain in his right ankle and knee." (Am. Compl. 10.) Plaintiff also alleges that he "constantly feels the aftermath" of these injuries and "at times he is unable to sit or stand for long periods" or "jump off his right leg as he normally did prior to the injury." (*Id.*) Because, as discussed below, the Court concludes that Plaintiff fails to allege deliberate indifference to his ankle and knee injuries, the Court need not resolve whether Plaintiff has sufficiently alleged a serious medical condition based on these injuries.

For purposes of establishing deliberate indifference based on inadequate medical treatment, "[i]t has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill*, 657 F.3d at 123 (citing *Estelle v. Gamble*, 429 U.S. 97, 106–107 (1976)). "[M]ere disagreement over the proper

treatment does not create a constitutional claim." *Id.* Therefore, "the 'essential test is one of medical necessity and not one simply of desirability.'" *Id.* (citations omitted) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). Moreover, medical treatment that is merely negligent is not sufficient to satisfy the deliberate indifference prong. *See Farid v. Ellen*, 593 F.3d 233, 248–49 (2d Cir. 2010).

Plaintiff alleges he sought "immediate medical attention" and "was provided an [ACE] bandage and pain medication only" which, Plaintiff claims, constituted "the bare minimum." (Am. Compl. 10.) Plaintiff also alleges that "no follow up [was] provided by the medical staff." (*Id.* at 4.) As an initial matter, the allegations are unclear as to who exactly provided Plaintiff with the ACE bandage and pain medication.[16] While Plaintiff's reference to "the medical staff's" failure to provide follow up treatment implies Plaintiff received treatment from the BK Detention Center medical staff in the first instance, Plaintiff does not expressly allege the source of the medical treatment. As such, for purposes of alleging the subjective, deliberate indifference prong, the allegations are unclear as to who may have been aware of Plaintiff's injuries and failed to provide adequate treatment.

In any event, Plaintiff has not alleged facts tending to show that treatment of his knee and ankle injuries with an ACE bandage and pain medication constituted deliberate indifference. In fact, Plaintiff's characterization of the treatment he received as the "bare minimum" suggests the treatment Plaintiff received was within a permissible range which — even assuming the treatment Plaintiff received was at the bottom of the range — is not sufficient to plead deliberate

---

[16] Plaintiff alleges in relevant part: "Plaintiff [sought] immediate medical attention, nevertheless, [he was] provided the bare minimum, an [ACE] bandage and pain medication only;" and "[a]s a result [of the alleged injuries] [Plaintiff] was provided an [ACE] bandage and pain medication only. No follow up provided by the medical staff." (Am. Compl. 4, 10.)

indifference.

Plaintiff has therefore failed to state a claim for deliberate indifference to a serious medical condition based on the treatment of Plaintiff's knee and ankle injuries at BK Detention Center.

### iv. Strip search claim

Plaintiff alleges his Fourth Amendment rights were violated because he was subjected to an unreasonable strip search while he was incarcerated in a DOC facility on Rikers Island. Plaintiff alleges that, in retaliation for his offer to assist a DOC captain who was attempting to quell an argument between Jane Doe # 3 and an inmate who did not speak English by translating, Plaintiff was subjected to a strip search by DOC "special unit" officers John Doe # 4 (Badge # 665), John Doe # 5 (Badge # 1683), and John Doe # 6 (Badge # 11511). (Am. Compl. 10.) Plaintiff alleges he was ordered to strip naked in his cell in full view of inmates in an adjacent building. (*Id.* at 11.) The City asserts Plaintiff fails to state a claim because courts have upheld strip searches of prisoners regardless of their detainee status and notwithstanding that the search was conducted in view of other inmates and staff. (City Mem. 10–12.) The City also argues that the alleged strip search was reasonably related to the legitimate penological interest in the "personal safety of correction officers and inmates alike." (*Id.* at 11.) The City further claims that, absent substantial evidence that the alleged strip search was an exaggerated response, deference to the discretion of correction officials is required. (*Id.* at 12.)

In considering Fourth Amendment challenges to strip searches performed by jail and prison personnel, courts are to "defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence v. Bd. of Chosen Freeholders of Burlington*, 566

U.S. ---, ---, 132 S. Ct. 1510, 1513–14 (2012).  Strip searches do not violate the Fourth

Amendment if they are performed pursuant to policies that are "reasonably related to legitimate

penological interests."  *Id.* at ---, 132 S. Ct. at 1515 (quoting *Turner v. Safley*, 482 U.S. 78, 89

(1987)).  In each case, the "need for a particular search must be balanced against the resulting

invasion of personal rights."  *Id.* at ---, 132 S. Ct. at 1516 (quoting *Bell v. Wolfish*, 441 U.S. 520,

569–70 (1979)).  Policies striking "a reasonable balance between inmate privacy and the needs

of . . . institutions" must be upheld.  *Id.* at ---, 132 S. Ct. at 1513–14.

In *Florence*, the Supreme Court upheld the strip search of a detainee following his arrest

for a minor offense because the search was conducted pursuant to a policy whereby all incoming

detainees were strip searched during intake and prior to their introduction into the general inmate

population.  *Id.* at ---, 132 S. Ct. at 1518.  The strip search policy was reasonable given the

legitimate penological interests in detecting contraband, visually inspecting incoming inmates for

tattoos and other signs of gang affiliations, and identifying wounds or other medical conditions

requiring treatment.  *Id.* at ---, 132 S. Ct. at 1518–20.

In other cases, searches conducted pursuant to established, non-discretionary prison

policies have similarly been upheld as reasonable.  *See Bell*, 441 U.S. at 558–61 (upholding

policy requiring inmates to "expose their body cavities for visual inspection as a part of a strip

search conducted after every contact visit with a person from outside the institution" based on

legitimate security interest in detecting contraband); *Covino v. Patrissi*, 967 F.2d 73, 75, 77–80

(2d Cir. 1992) (upholding policy of random, visual, body-cavity inspections of all inmates given

legitimate interest in detecting drugs and because searches were conducted in inmates' rooms

with door closed so as to limit invasion of privacy).

However, while *Florence* "confirmed the importance of deference to correctional

officials," 566 U.S. at ---, 132 S. Ct. at 1515, the Court expressly did not address "instances of officers engaging in intentional humiliation and other abusive practices," *id.* at ---, 132 S. Ct. at 1523.  Indeed, strip searches that are not conducted in order to advance a legitimate penological interest, and are instead performed to punish an inmate, are not reasonable.  *See Turkmen v. Hasty*, 789 F.3d 218, 261 n.44 (2d Cir. 2015) (affirming denial of motion to dismiss detainees' claims pursuant to Fourth Amendment because, *inter alia*, plaintiffs "plausibly alleged that they were strip searched when there was no opportunity to acquire contraband, including in instances where they were shackled and under escort, or were never permitted to leave their cells"); *Iqbal v. Hasty*, 490 F.3d 143, 172 (2d Cir. 2007) (allegations that plaintiff was subjected to strip and body-cavity searches every morning were sufficient to state a claim pursuant to Fourth Amendment), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

As is clear from the cases relied on by the City, reasonableness turns on weighing the particular purpose for and manner in which the strip search at issue is conducted.  *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (finding that "a strip search of a male prisoner in front of female officers, if conducted for a legitimate penological purpose, would fail to rise to the level of a" constitutional violation); *Elliot v. Lynn*, 38 F.3d 188, 191–92 (5th Cir. 1994) (concluding that visual body cavity search conducted in presence of other inmates and correctional officers for purpose of detecting weapons was reasonable given legitimate security concerns where prison was responding to an "emergency situation created by an increasing number of prison murders, suicides, stabbings, and cuttings"); *Franklin v. Lockhart*, 883 F.2d 654, 656–57 (8th Cir. 1989) (holding that strip searches of inmates in punitive segregation that were conducted in view of other inmates were justified by legitimate security concerns, noting that punitive segregation housed "some of the most recalcitrant inmates"); *Israel v. City of New*

*York*, No. 11-CV-7726, 2012 WL 4762082, at *2–3 (S.D.N.Y. Oct. 5, 2012) (three strip searches of a pre-trial detainee were permissible when conducted pursuant to established, express DOC policies serving legitimate interest in preventing contraband smuggling); *Brown v. Graham*, No. 07-CV-1353, 2010 WL 6428251, at *13–14 (N.D.N.Y. Mar. 30, 2012) (determining search was reasonable where plaintiff did not allege it was conducted to intimidate, harass, or punish, and defendant produced evidence that search was conducted for protection of plaintiff, who was on suicide watch).

Here, the City gives short shrift to the issue of the precise penological interest served by a strip search conducted under the circumstances alleged. The City claims that Plaintiff "inserted himself into the middle of a verbal dispute between a correction official and an inmate. Thus, a strip search was a reasonable response to the situation in light of the security concerns that Plaintiff's involvement raised." (City Mem. 12.) Accepting Plaintiff's allegations as true, Plaintiff "inserted" himself into the verbal dispute in an attempt to assist DOC staff. (Am. Compl. 10.) The alleged strip search was not applied as a matter of course but rather, Plaintiff claims, to intimidate, harass and punish Plaintiff. (*Id.*) Nor has the City asserted the penological interest served by strip searching an inmate who has "inserted himself into the middle of a verbal dispute between a correction official and an inmate." (City Mem. 12.) The action alleged by Plaintiff does not fall within the category of reasonable conduct identified by the Supreme Court in *Florence*.[17] *See Florence*, 566 U.S. at ---, 132 S. Ct. at 1523 (Court's opinion expressly

---

[17] Although the City appears only on its own behalf, in a footnote the City notes in passing that John Does # 4, 5 and 6 "would be entitled to qualified immunity . . . because *Florence* allows correction officers wide latitude to further legitimate penological interests." (City Mem. 12 n.4.) As the City is not appearing on behalf of John Does # 4, 5 and 6 and this issue has not been briefed, the Court makes no determination as to the entitlement of John Does # 4, 5 and 6 to qualified immunity.

declined to consider strip search where corrections officers engage in "intentional humiliation and other abusive practices."). Thus, Plaintiff has stated a plausible claim that his Fourth Amendment rights were violated by Jane Doe # 3 and John Does # 4, 5 and 6 as a result of the alleged strip search.[18] However, as discussed below, Plaintiff has not alleged municipal liability and there is no plausible basis to conclude the City could be liable pursuant to § 1983 in connection with the alleged strip search. The Court directs the City in accordance with *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam), to ascertain the full names of the DOC personnel alleged to be Jane Doe # 3 and John Does # 4, 5 and 6 based on the badge numbers alleged in the Amended Complaint — John Doe # 4 (Badge # 665), John Doe # 5 (Badge # 1683), and John Doe # 6 (Badge # 11511) — and the alleged date, location and circumstances of the strip search. *Colson v. N.Y. Police Dep't*, No. 13-CV-5394, 2015 WL

---

[18] The Court rejects the City's claim that Plaintiff is barred from seeking compensatory relief pursuant to § 1997e(e) of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), which the City claims bars recovery for claims based on mental or emotional injury suffered while in custody absent a prior showing of physical injury. (City Mem. 13.) Even absent a showing of physical injury, § 1997e(e) does not preclude recovery of nominal or punitive damages and injunctive or declaratory relief. *See Toliver v. City of New York*, 530 F. App'x 90, 93 n.2 (2d Cir. 2013) (holding that, even if prisoner could not establish physical injury, § 1997e(e) would not bar recovery of nominal and punitive damages); *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) ("Section 1997e(e) . . . . does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief."); *Robinson v. Cattaraugus Cty.*, 147 F.3d 153, 161 (2d Cir. 1998) (holding trial court's instruction to jury that compensatory damages were a prerequisite to punitive damages was erroneous, "[w]e have long recognized in § 1983 cases that punitive damages may be awarded even in the absence of a compensatory award"); *id.* at 162 ("If a jury finds that a constitutional violation has been proven but that the plaintiff has not shown injury sufficient to warrant an award of compensatory damages, the plaintiff is entitled to an award of at least nominal damages as a matter of law."); *Frieson v. City of New York*, No. 11-CV-4611, 2012 WL 1948782, at *2 (S.D.N.Y. May 30, 2012) ("[T]he PLRA allows for the recovery of some damages beyond nominal damages, for example, punitive damages."). Moreover, a plaintiff is not required to plead physical injury in a complaint covered by the PLRA. *Malik v. City of New York*, No. 11-CV-6062, 2012 WL 3345317, at *16 (S.D.N.Y. Aug. 15, 2012) ("[A] plaintiff need not plead physical injury in a complaint covered by the PLRA.").

64688, at *10 (E.D.N.Y. Jan. 5, 2015). The City is directed to provide the foregoing information to Plaintiff and the Court.

### v. Municipal liability

Plaintiff asserts claims against the City of New York pursuant to 42 U.S.C § 1983 based on Plaintiff's alleged unlawful arrest, the injuries Plaintiff sustained and the medical care he received at BK Detention Center, and Plaintiff's strip search by corrections officers at a DOC facility on Rikers Island. Having determined that the Amended Complaint fails to state claims pursuant to Section 1983 based on Plaintiff's arrest, alleged injuries, or the medical treatment he received at BK Detention Center, the Court considers the sufficiency of the municipal liability allegations.

In order to sustain a claim for relief pursuant to Section 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."); *see Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) ("[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (alteration in original) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007))). A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by

municipal officials with decision-making authority; (3) a practice so persistent or widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. *See Parker v. City of Long Beach*, 563 F. App'x 39, 41 (2d Cir. 2014) (failure to train); *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 72 (2d Cir. 2014) (persistent and widespread practice); *Schnitter v. City of Rochester*, 556 F. App'x 5, 9 (2d Cir. 2014) (failure to train or supervise); *Hines v. Albany Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) (actions of policymakers); *Missel v. Cty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality).

Here, all of the allegations in the Amended Complaint that pertain to a policy or custom, of any kind, relate to John Doe # 2. Plaintiff alleges that "John Doe # 2 failed to fulfill the duties required of him [] as an NYPD officer" "to protect and serve the public [as] mandated by the City of New York," and claims John Doe # 2's "refusal to [protect] the public's 'safety, peace, and order' [in accordance with] the New York City Police Department's responsibilities to protect and serve, violated customs and / or policy." (Am. Compl. 8.) Similarly, Plaintiff alleges "John Doe # 2 [failed to adhere to] NYPD custom and / or policy [and] disregarded [the NYPD's] motto of 'Courtesy, Professionalism, Respect.'" (*Id.*) Although, as discussed above, Plaintiff has stated a claim based on the alleged strip search, the Amended Complaint does not allege that the strip search was conducted pursuant to an official policy or custom.

Plaintiff appears to misinterpret the nature of the official policy or custom that must be alleged in order to state a claim against a municipal defendant such as the City of New York pursuant to Section 1983. A Plaintiff must allege that his Section 1983 is predicated on an injury

that was caused by *adherence* to an official policy or custom, as opposed to an injury caused by the *violation* of an official policy or custom.[19]  *See Newton v. City of New York*, 779 F.3d 140, 152 (2d Cir. 2015) (plaintiff must sufficiently allege municipal policy or custom was carried out and, consequently, "caused the plaintiff's injury" (quoting *Bd. of Cty. Comm'rs of Bryan Cty. Okla. v. Brown*, 520 U.S. 397, 403 (1997))); *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Liability under section 1983 is imposed on the municipality when it has promulgated a custom or policy that violates federal law and, *pursuant to that policy*, a municipal actor has tortiously injured the plaintiff." (emphasis added)); *see also Ghaster v. City of Rocky River*, 913 F. Supp. 2d 443, 470–71 (N.D. Ohio 2012) ("A *Monell* claim alleges that a prohibited policy was carried out, not that a policy was violated.").  As Plaintiff has failed to allege an injury resulting from an official policy or custom, Plaintiff has not sufficiently alleged a *Monell* claim.

### III.  Conclusion

For the foregoing reasons, the Court grants Zouvelos' motion to dismiss and dismisses the Amended Complaint as to him.  The Court also *sua sponte* dismisses the Amended Complaint as to Conwell.  The Court grants the City of New York's motion to dismiss the Amended Complaint against the City of New York but directs the Clerk of Court to substitute Jane Doe # 3, John Doe # 4 (Badge # 665), John Doe # 5 (Badge # 1683), and John Doe # 6 (Badge # 11511) as Defendants.  The Court orders the City of New York to ascertain the full names and service addresses of Jane Doe # 3 and John Does # 4, 5 and 6 and to provide this

---

[19]  Plaintiff continues to misconstrue the requirement in his opposition to the City and Zouvelos' motions to dismiss.  Plaintiff asserts that "his averment in regards to 'Custom or Policy', is the City failed to protect him after they [sic] were alerted two days prior he did not have an active warrant." (Pl. Opp'n Mem. 7.)  Plaintiff also asserts that, among the "question[s] before this Court" is the question, "[d]id failure to protect [Plaintiff] constitute a violation of the City's custom and policy."  (*Id.* at 8.)

information to Plaintiff and the Court within thirty (30) days from the date of this Memorandum and Order. Upon receipt of the foregoing information, the Clerk of Court is directed to amend the caption to substitute the names for Jane Doe # 3 and John Does # 4, 5 and 6 and to forward copies of the following documents to the United States Marshal Service for service upon Jane Doe # 3 and John Does # 4, 5 and 6: (1) the Amended Complaint; (2) summonses for Jane Doe # 3 and John Does # 4, 5 and 6; and (3) this Memorandum and Order. Plaintiff's Fourth Amendment strip search claim will proceed against Jane Doe # 3 and John Does # 4, 5 and 6.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 23, 2015
       Brooklyn, New York